# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

WILLIAM YOUNG,                :     Case No. 1:11-cv-119
                                    :

        Plaintiff,             :     Judge Timothy S. Black
                                      :

vs.                              :
                                      :

THE DAYTON POWER AND LIGHT     :
COMPANY,
                                      :

        Defendant.          :

## DECISION AND ENTRY GRANTING THE MOTION OF THE DAYTON POWER AND LIGHT COMPANY FOR SUMMARY JUDGMENT (DOC. 12)

This civil case is before the Court on the Motion of the Dayton Power and Light Company ("DP&L") for Summary Judgment. (Doc. 12). Plaintiff William Young ("Young") filed a Memorandum Contra DP&L's Motion. (Doc. 16). DP&L then filed a Reply Memorandum. (Doc. 18). DP&L's Motion for Summary Judgment is now ripe.

## I. STATEMENT OF FACTS[1]

Plaintiff William Young ("Young") began employment with Defendant Dayton Power and Light ("DP&L") on January 14, 1980 as a Series B coal handing operator. Young continued in his employment with DP&L for over thirty years, until December 13,

---

[1] Pursuant to the Standing Order of the Court, DP&L filed a statement of Proposed Undisputed Facts (Doc. 17) and Young filed a Response to DP&L's Proposed Undisputed Facts (Doc. 19). Young generally denied paragraphs 11 through 16 as proposed by DP&L, as well as a sentence proposed by DP&L in paragraph 25. (Doc. 19). As set forth in the Court's General Order, "[a]ll material facts set forth in" the movant's statement of proposed undisputed facts "will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party[.]" Consistent with the Court's Standing Order, this Statement of Facts essentially incorporates the Proposed Undisputed Facts presented by DP&L, minus immaterial portions set forth in paragraphs 11 through 16 and 25 objected to by Young.

2010, when DP&L concluded that Young abandoned his position by failing to show for work. During his employment, Young worked on a crew that included anywhere from eight to twelve people working in rotating shifts, some day shifts and some night shifts. Young describes his relationship with his co-workers as "family" at times and "children" at other times. Young contends that he was subjected to harassment by many employees during his employment with DP&L.

In November 1995, Young was criminally prosecuted in Adams County, Ohio, on charges that he molested a little girl in his neighborhood. A jury acquitted Young of the criminal charges following trial. Shortly after the trial, Young became depressed, began taking Zoloft and was hospitalized some time in 1996 for mental health issues at Stoner Creek Counseling Centre in Paris, Kentucky. Upon returning to work, a particular co-worker, G.L., began calling him names like "baby raping bitch." Young reported G.L.'s actions to a supervisor, who eventually resolved the issue.

At some unknown time before 2005, a co-worker, D.J., asked Young for oral sex at work. Young admitted that he never reported the incident to DP&L because it was "too embarrassing." In 2008, after Young told his co-workers that he was going to the hospital for hemorrhoid surgery, D.J. asked Young if he was going to a mental hospital.

Young contends that a co-worker, D.W., did "piddly" things to him, such as follow Young in his car and run his bright lights. D.W. also threw Young's tools away. D.W. and another co-worker, B.O., tried to convince Young to take a new MSO job classification by stating that they did not need anymore "worthless [Series] B [coal

handling] men."[2]  Young also testified that B.O. told DP&L maintenance employees that Young was "doing their job. And it caused a great big stink."

Young also testified that one day co-worker J.V. "[blew] up at [him]," "called [him] all kinds of names and stuff," and "shook her fist" at him; co-worker R.C. told Young that there was no use for Young to move to R.C.'s neighborhood because "they wouldn't even allow an old cocksucker like you down there;" co-worker E.C. told Young some time in 2008 that Young to run the loader one day, which Young did not want to do because Young felt that it was not his job.

Finally, in February 2009, Young reported to DP&L that unknown co-workers wrote phrases about him on walls and in coal dust throughout the DP&L facility.  The record in this case shows that such writing stated: "Bill Bastard" "Bastard Bill Y" "B.Y. Bastard" "Bastard Bill Young" "Bill Y Child Molester" "Bill Young like my kids" "Grow up Bill Young big cry baby" "Bill Young loves little boys" "Bill Y pervert" "Cocksuck Bill Y" "Bill Young takes it in the ass" "Bill Young Rat."  Young contends that such conduct had been occurring for years.  After Young notified DP&L of the writing,

---

[2]  In February 2009, the Series B coal handling operators, including Young, had the opportunity to bid on Material Systems Operator ("MSO") positions created by an agreement between DP&L and a union representing DP&L employees.  Coal handling operators, including Young, had the opportunity to take the new MSO classification at higher pay., and while most Series B coal handling operators accepted this opportunity, Young refused the move for nearly a year.  During the time Young rejected the MSO job, several co-worker "turned against" him because he did not approve of being forced to work overtime because other employees turned overtime down.  Young admitted that being forced to work overtime on occasion was how the union contract operated, and that the overtime/"job staging" issue did not cause Young any trouble.  Young testified that co-worker M.A. attempted to get Young to accept the MSO job by stating that "we need you in the job," which Young felt was harassing.

DP&L's plant manager, Mark Guerriero, conducted a meeting and DP&L promptly made an effort to remove the writing.

After reporting the graffiti in February 2009, Young entered DP&L's Employee Assistance Program at the urging of his union representative. Young was off work for approximately four months. In March 2009, during his leave, Young went to DP&L headquarters in Dayton, and presented pictures of the coal dust graffiti to DP&L human resources employee Susan Spires. Spires informed Young that, when he was ready to return to work, he would be assigned to a different crew.

During leave and thereafter, Young saw John Swann with DP&L's Employee Assistance Program. On April 9, 2009, Swann sent a letter to DP&L stating that he had been seeing Young on a weekly basis since February 2009, that Young's "progress in therapy has been good, and the prognosis for return to work appears to be excellent if behaviors leaving [sic] to his departure are eliminated. [Young] should also not be subjected to ridicule or disrespect by his colleague or others assigned to the work environment." Young agreed with the content of Swann's letter.

On May 6, 2009, Swann sent another letter to DP&L reporting that Young "has improved to the point that a return to work is now possible given that the stressors present at admission have been addressed and corrective action initiated." Young agreed that he was ready to return to work, and did so on May 22, 2009. As promised by Spires, Young was assigned to a different crew, this time working on "C" crew. On that same day and continuing into June, DP&L conducted workplace harassment training for its employees,

which Young attended along with other DP&L employees.

Young enjoyed working with his new crew and the new crew accepted him well. During a meeting with Swann on July 7, 2009, Young reported that he experienced no harassment with his new co-workers and he was pleased with DP&L's efforts to educate the employees and prevent further incidents. Again, on August 11, 2009, Swann noted that Young continued to make good adjustments upon his return to DP&L, that he did not experience any harassment, and that Young was pleased with management's efforts to train employees on harassment and insure a safe work environment. Young believed that DP&L's human resources department was doing everything it could do to assist him.

In early 2010, Young began signing up to work overtime but failing to work the overtime shift. On January 15, 2010, Young accepted overtime work for January 16, but called in the evening of January 15 to say that he would not be working overtime due to "harassment." Young believed that he was being forced to work overtime when other employees were not being forced to work overtime. Again, on January 26, 2010, Young accepted overtime for January 27, then wrote on the overtime list on January 26 that he was not going to work the overtime shift.

On January 29, 2010, Young had a meeting with his supervisors about these overtime incidents. Young agreed that DP&L was reasonable in its request that Young should not accept overtime and then refuse to work. On February 5, 2010, Young had a follow-up meeting with his supervisors concerning the same issues regarding overtime. Young agreed that DP&L was correct in addressing the issue with him.

On June 2, 2010, Young testified that he came out of the shower at DP&L and could not locate his clean clothes. Young believed that somebody had taken them. Young reported the incident to Jerry Howard, his supervisor. Days later, on June 4, 2010, Young reported to work at DP&L at one in the morning despite not being scheduled to work. Young does not recall going to work that day. According to Young, he simply does not remember two or three whole days during that period of time. After this incident, DP&L suggested that Young see a physician for an evaluation.

On June 11, 2010, Young saw Dr. Mark Wallingford, who, upon evaluating Youngs' physical and mental health, opined that there were no physical, emotional, or psychiatric reasons Young could not perform his job. On July 8, 2010, Young met with Dr. Jean Cooper, who, based upon her evaluation of Young, recommended that Young could return to the same work environment if he increased his Zoloft medication. Despite Dr. Cooper's recommendation, Young did not return to work.

When Young failed to return to work pursuant to Dr. Cooper's recommendation, DP&L offered Young a disability package on or about October 8, 2010. The offer was presented as a "resolution of all contractual or other legal rights [Young had] concerning [his] employment with [DP&L]." The package would have paid Young disability until age 65 with an additional sum of $40,526.64, but required that Young "agree [to] never sue DP&L . . . or any people employed by the Company for any act that occurred on or before the effective date of [the] agreement." Wanting to return to work, Young rejected the disability package offer.

On December 2, 2010, when Young still had not returned to work pursuant to Dr. Cooper's recommendation, DP&L Station Manager Mark Guerriero sent Young a letter informing him that there had been no medical report indicating that he could not return to work, and that he would no longer be paid effective December 3, 2010.  Guerriero told Young to report to his normal work location with "C" crew on December 8, 2010 at 7:00 p.m.  Guerriero informed Young that if he did not report to work at that time, it would be deemed an abandonment of his job.

Notwithstanding his receipt of Guerriero's letter, Young decided not to return to work.  On December 8, 2010, when he failed to return to work as directed, Guerriero sent Young another letter informing him that a transfer and day shift positions were not options at DP&L and, nevertheless, they were not mandatory recommendations set forth by Dr. Cooper.  In keeping with Dr. Cooper's recommendations that Young could return to work upon an increase in his medication, DP&L extended the time by which Young had to report to work to December 13, 2010.  Guerriero again noted that should Young fail to return to work by December 13, 2010, such failure would be deemed job abandonment.

Young failed to return to work on December 13, 2010.  On December 16, 2010, Guerriero sent Young another letter informing him he was voluntarily terminated from employment as a result of his failure to report to work.

On February 28, 2011, Young filed a Complaint against DP&L asserting the following claims: (1) sex discrimination in violation of Title VII, 42 U.S.C. § 2000e-2,

2000e-5, 1981a and Ohio Rev. Code §§ 4112.02 and 4112.99; (2) a violation of the

Rehabilitation Act and the Americans With Disabilities Act ("ADA"); (3) intentional and

negligent infliction of emotional distress; and (4) defamation. (Doc. 1). DP&L now

moves for summary judgment on all claims asserted by Young.

## II.  STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to

the Court demonstrates that there is no genuine issue as to any material fact and that the

movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247-248 (1986).

"Summary judgment is only appropriate 'if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law.'" *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881,

886 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). "Weighing of the evidence or making

credibility determinations are prohibited at summary judgment  -  rather, all facts must be

viewed in the light most favorable to the non-moving party." *Id*.

Once "a motion for summary judgment is properly made and supported, an

opposing party may not rely merely on allegations or denials in its own pleading[.]"

*Viergutz v. Lucent Technologies, Inc.*, 375 Fed. Appx. 482, 485 (6th Cir. 2010) (citing

Fed. R. Civ. P. 56(e)(2)).  Instead, the party opposing summary judgment "must - by

affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial." *Id.* (citing Fed. R. Civ. P. 56(e)(2)).

## III.  ANALYSIS

### A.  <u>Sexual Harassment</u>

DP&L moves for summary judgment on Young's state and federal claims asserting sexual harassment, arguing that Young fails to evidence a *prima facie* case of sex discrimination/hostile work environment.  "[S]ex discrimination claims under Ohio Revised Code § 4112 are analyzed according to the same standards used to analyze federal discrimination claims under Title VII." *Myers v. Cuyahoga Cnty.*, 182 Fed.Appx. 510, 517 (6th Cir. 2006) (citing *Cincinnati Bar Ass'n. v. Young*, 89 Ohio St.3d 306, 731 N.E.2d 631 (2000)); *see also Sullivan v. Coca-Cola Bottling Co. of Ohio/Kentucky*, 182 Fed.Appx. 473, 477 (6th Cir. 2006).

"Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an individual 'with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 762 (6th Cir. 2006)(citing 42 U.S.C. § 2000e-2(a)(1)).  "A violation of Title VII is established if 'discrimination based on sex has created a hostile or abusive work environment.'" *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008) (citing *Burnett v. Tyco Corp.*, 203 F.3d 980 (6th Cir.2000); *Meritor Sav. Bank v. Vinson*, 477 U.S. 57 (1986)).

However, "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat [ion] ... because of ... sex.'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). To prevail, a plaintiff must show more than mere use of words that "have sexual content or connotations." *Id.* "The critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993) (Ginsburg, J., concurring)).

As set forth by the Sixth Circuit:

> To establish a prima facie case based upon coworker harassment, a plaintiff must establish that (1) the sexual harassment was unwelcome, (2) the harassment was based on sex, (3) the harassing behavior was sufficiently severe or pervasive to affect the terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment, and (4) the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

*Hawkins*, 517 F.3d at 332 (citing *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451 (6th Cir.2004); *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 729 N.E.2d 726)).

Here, DP&L argues that Young's claim fails because the alleged harassment encountered was not "based on sex." Young contends that the alleged harassment was based on sex because certain comments concerned "statements of homosexual conduct[.]" (Doc. 16, PAGEID 233). Male plaintiffs can prove that harassment by another male was based on sex by showing one of these three situations: "(1) where the harasser making

sexual advances is acting out of sexual desire; (2) where the harasser is motivated by general hostility to the presence of men in the workplace; and (3) where the plaintiff offers 'direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.'" *Taylor v. H.B. Fuller Co.*, No. 06cv854, 2008 WL 4647690, at *6 (S.D. Ohio Oct. 20, 2009) (citing, *Oncale*, 523 U.S. at 80-81).

With regard to advances by a harasser motivated by sexual desire, Young, in his memorandum, does not point to any specific evidence that any alleged harasser acted out of sexual desire. While some of the statements written about Young around the DP&L facility, in and around February 2009, contained words of sexual content or had sexual connotations,[3] nothing in the record demonstrates that those messages were written out of sexual desire for Young, and the context of the statements suggests otherwise. Further, there is no evidence that the co-worker calling Young a "baby raping bitch" in 1996 was motivated by sexual desire, or that a different co-worker telling Young that "they wouldn't even allow an old cocksucker like you" in the co-worker's hometown was motivated by sexual desire.

The Court's own review of the record shows one instance, occurring sometime before 2005, where a co-worker asked Young for oral sex. That single instance occurring over five years before Young's termination, in and of itself, is insufficient demonstrate a "workplace . . . permeated with 'discriminatory intimidation, ridicule or insult'

---

[3] Namely the statements: "Bill Y Child Molester" "Bill Young like my kids" "Bill Young loves little boys" "Bill Y pervert" "Cocksuck Bill Y" "Bill Young takes it in the ass."

sufficiently severe or pervasive to alter the conditions of employment." *Hawkins*, 517

F.3d at 333 (citations omitted).[4]  And nevertheless, Young admits that he never informed

DP&L of this incident.  (Doc. 9, PAGEID 56).

Finally, Young points to no evidence to demonstrate that any alleged harasser was

motivated by general hostility to the presence of men in the workplace, and further fails to

point to any evidence comparing how alleged harassers treated members of both sexes in

a mixed-sex workplace.  In light of all the foregoing, the Court concludes that no genuine

issues of material fact remain and that DP&L's Motion for Summary Judgment on

Young's claims of sexual harassment under state and federal law is **GRANTED**.[5]

B.     **Disability Discrimination**

Next, DP&L argues that Young fails to establish a *prima facie* case of disability

discrimination under the Rehabilitation Act and the ADA[6] because Young admitted that

_____

[4]  The Court in *Hawkins*, stated that, in determining whether a workplace is sufficiently severe and pervasive, courts consider "[a] nonexhaustive list of factors" that "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Hawkins*, 517 F.3d at 333 (citing *Jordan v. City of Cleveland*, 464 F.3d 584 (6th Cir. 2006); *Harris*, 510 U.S. at 23).

[5]  The Court also notes the lack of any evidence that DP&L failed to take immediate and appropriate corrective action with regard to incidents of which it was or should aware. The only instances which DP&L arguably knew about include the co-worker calling Young a "baby raping bitch," which stopped after corrective action (Doc. 9, PAGEID 57-58), and the writings about Young around the DP&L facility, which Young stated he was satisfied with DP&L's response. (Doc. 9, PAGEID 61-62).

[6]  "Rehabilitation Act claims are subject to the same standard as are ADA claims." *Dendinger v. Ohio*, 207 Fed.Appx. 521, 528 (6th Cir. 2006) (citing 29 U.S.C. §§ 791(g), 794(d)).

he was not disabled and because Young was able to return to work if he simply increased his medication. "Title I of the ADA provides that a covered employer 'shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" *Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011) (citing 42 U.S.C. § 12112(a)).

Here, Young appears to argue that DP&L discriminated against him when it failed to accommodate his purported disability. As set forth by the Sixth Circuit:

> In order to establish a prima facie case for failure to accommodate, a plaintiff must show that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation.

*Johnson v. Cleveland City Sch. Dist.*, 443 Fed.Appx. 974, 982-83 (6th Cir. 2011) (citing *DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004)).

In response to DP&L's contention that Young is not disabled and could have returned to work, Young appears to argue that he was disabled and unable to return to work simply with an increased dosage of Zoloft.[7] Young points specifically to Dr. Jean Cooper's July 8, 2010 psychiatric evaluation wherein she recommends that:

---

[7] Young also points to the fact that DP&L offered Young a disability package to settle any claims Young may have asserted against DP&L in an effort to note the irony in DP&L now arguing that Young is not disabled. The Court finds no significance to DP&L's settlement offer in determining whether Young was disabled under the ADA.

1.      If patient is to return to the same work environment, would recommend that his Zoloft be increased to 50 mg [a] day. Otherwise it can continue at the current dose of 25 mg [a] day.

2.      Recommend that patient be transferred to another location or work assignment to get him out of his current environment and away from the people that are harassing him.

3.      Recommend that patient be on a regular set shift – preferably day – so that he can get a normal 8 hours of sleep at night.

(Doc. 9-3, PAGEID 100). Young argues that Dr. Cooper's recommendation regarding the increase in Zoloft proves his inability to return to work because, at the time of the recommendation, Young was already taking 50 mg of Zoloft per day.[8]

The Court finds no merit to Young's contentions. Dr. Cooper, in her deposition, clarified her recommendations regarding the increase in Zoloft. Dr. Cooper testified that if, at the time she evaluated Young, she knew he was already taking 50 mg of Zoloft per day, she would have recommended that Young's dosage be increased to 100 mg per day should he return to the same position. (Doc. 10, PAGEID 177). As Dr. Cooper clarified, her recommendation regarding Zoloft was not focused on the exact amount of Zoloft Young should take, but instead, was a simple "recommendation . . . to increase his dose." (Doc. 10, PAGEID 180). When asked whether it was her opinion that Young "could have returned back to work if he had an increase in his Zoloft, whatever that increase may have

---

[8] Without much elaboration, Young also appears to contend that Dr. Cooper's recommendations were conjunctive, not disjunctive. At deposition, Dr. Cooper testified that her recommendations were "intended to be alternative to each other." (Doc. 10, PAGEID 176). Thus, Young's apparent argument in this regard is without merit.

needed to be[,]" Dr. Cooper responded, "yes."  (Doc. 10, PAGEID 179).

Based on Young's admission that he is not disabled (Doc. 9, PAGEID 46), was never disabled, and based on Young's failure to evidence his disability, the Court concludes that Young is not disabled.  Accordingly, the Court finds merit in DP&L's Motion for Summary Judgment on this basis alone.

Even assuming Young is or was disabled, there is no evidence that DP&L failed to reasonably accommodate Young's disability.  Dr. Cooper concluded that Young was able to return to work if he increased his Zoloft dosage per day.  Despite this recommendation, Young refused to return to work.  While Young could argue that DP&L should have transferred him to another location or work assignment, and that DP&L should have placed Young on a regular shift, the evidence presented demonstrates that no such positions existed.[9]  "It is well settled that an employer has no duty under the ADA to create a position or to bump a present employee out of his or her position to make a reasonable accommodation."  *Williams v. United Parcel Services, Inc.*, No. 2:10-1546-RMG, 2012 WL 601867, at *6 (D.S.C. Feb. 23, 2012).

Accordingly, based on all of the foregoing, DP&L's Motion for Summary Judgment on Young's Rehabilitation Act and ADA claims are **GRANTED**.

---

[9] On December 8, 2010, Young received a letter from DP&L informing him that no such positions existed.  DP&L cited this letter in its Motion, as well as its Proposed Statement of Undisputed Facts.  Young has not disputed this fact at any point, and, therefore, such statement of fact is deemed admitted.

### C.     Intentional Infliction of Emotional Distress

DP&L also moves for summary judgment on Young's claim of intentional infliction of emotional distress arguing that Young not only fails to evidence the elements required to establish such a claim, but that Young also fails to evidence DP&L's liability for the allegedly intentional tortious acts of its employees.

To prevail on a claim for intentional infliction of emotional distress under Ohio law, one must prove that:

> (1) the defendant intended to cause, or knew or should have known that his actions would result in serious emotional distress; (2) the defendant's conduct was so extreme and outrageous that it went beyond all possible bounds of decency and can be considered completely intolerable in a civilized community; (3) the defendant's actions proximately caused psychological injury to the plaintiff; and (4) the plaintiff suffered serious mental anguish of a nature no reasonable person could be expected to endure.

*Shugart v. Ocwen Loan Servicing, LLC*, 747 F.Supp.2d 938, 944-45 (S.D. Ohio 2010) (citations omitted).  Such a claim "must be based on more than 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Kimmel v. Lowe's Inc.*, No. 23982, 2011 WL 96317, at *2 (Ohio App. Jan. 7, 2011) (citing *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (Ohio 1983)).

For an employer to be liable for the acts of employees, "the tort of the employee must be committed within the scope of employment."  *Byrd v. Faber*, 57 Ohio St.3d 56, 59, 565 N.E.2d 584 (Ohio 1991).  Acts fall "within the scope of his employment if it is of the kind which he is employed to perform, occurs substantially within the authorized

limits of time and space, and is actuated, at least in part, by a purpose to serve the master." *Cooke v. Montgomery Cnty.*, 158 Ohio App.3d 139, 145, 814 N.E.2d 505 (Ohio App. 2004) (citing *Anderson v. Toeppe*, 116 Ohio App.3d 429, 688 N.E.2d 538 (Ohio App. 1996)).

"[A]n employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business." *Byrd*, 57 Ohio St.3d at 59. In the case of an alleged intentional tort, "the behavior giving rise to the tort must be 'calculated to facilitate or promote the business for which the servant was employed[.]'" *Id*. (citing *Little Miami RR. Co. v. Wetmore*, 19 Ohio St. 110 (Ohio 1869); *Taylor v. Doctor's Hosp.*, 21 Ohio App.3d 154, 486 N.E.2d 1249 (Ohio App. 1985)).

Here, Young fails to point to any evidence to support his apparent contention that DP&L is liable for intentional acts of its employees, and in fact, Young offers no argument in that regard. Because Young fails to meet his burden in this regard, DP&L's Motion for Summary Judgment on claims of intentional infliction of emotional distress is **GRANTED**.

### D.   Negligent Infliction of Emotional Distress

Next, DP&L moves for summary judgment on Young's claim of negligent infliction of emotional distress ,arguing that Ohio does not recognize such a claim in the employment context, and, regardless, Young fails to evidence such a claim even if it existed. DP&L also argues that DP&L, as an employer, is not liable for the acts of its employees. Young argues that he "was placed in a position of physical peril when he was

harassed in a manner that caused him confusion and memory loss during which he took risks of driving and operating heavy equipment" while on the way to and at work.

In Ohio, "[a] claim of negligent infliction of emotional distress is limited to instances 'where the plaintiff has either witnessed or experienced a dangerous accident or appreciated the actual physical peril.'" *Robinson v. Marc Glassman, Inc.*, No. 5:06cv1792, 2007 WL 3232450, at *8 (N.D. Ohio Oct. 31, 2007) (citing *Heiner v. Moretuzzo*, 73 Ohio St.3d 80, 652 N.E.2d 664 (1995)) *see also Doe v. SexSearch.com*, 551 F.3d 412, 417 (6th Cir. 2008) (finding no claim for negligent infliction of emotional distress where plaintiff's "alleged injuries result from embarrassment and harm to social standing and employment prospects" and never alleged "that he experienced a dangerous accident or appreciated actual physical peril").

Here, a claim of negligent infliction of emotional distress simply does not fit the facts at issue in this case. This case does not involve an accident scene, and Young admits to never being in physical peril at work:

> Q. Were you ever in any physical danger at work?
>
> A. Was I ever – any physical danger?
>
> Q. Yes, sir.
>
> A. Not that I'm aware of.
>
> Q. Or close to any physical danger?
>
> A. No.

(Doc. 9, PAGEID 66).

Accordingly, for these reasons and for the reasons set forth regarding employer liability above, the Court **GRANTS** DP&L's Motion for Summary Judgment on Young's claim of negligent infliction of emotional distress.

## E.     Defamation/Slander Per Se

Finally, DP&L moves for summary judgment on Young's claims of defamation/slander per se again arguing that it is not liable for intentional acts of its employees.  "Defamation is the publication or communication of a false statement of fact that injures someone by adversely affecting the person's (1) reputation, (2) business, or (3) position—by exposure to public hatred, contempt, ridicule, shame, or disgrace." *Fuchs v. Scripps Howard Broad. Co.*, 170 Ohio App.3d 679, 691, 868 N.E.2d 1024 (Ohio App. 2006) (citations omitted).

To prevail on a claim of defamation, a plaintiff must prove "that (1) the defendant made a false statement, (2) that false statement was defamatory in the sense that it reflected unfavorably on the plaintiff's character or injured his trade or business, (3) the statement was published or communicated, and (4) the defendant acted with the necessary degree of fault." *Id*. (citations omitted).  "A claim for defamation requires specific and personalized liability." *Shannahan v. B.F. Goodrich Aerospace Co.,* 993 F.Supp. 1107, 1118 (N.D. Ohio 1998).

Courts in this district have stated that "where an employee makes allegedly false or defamatory statements about another employee to co-workers or superiors or others, outside the parameters of a formal grievance procedure, she does so outside the scope of

her employment." *Allstate Ins. Co. v. Quick*, 254 F.Supp.2d 706, 712 (S.D. Ohio 2002) (citations omitted); *see also Chenault v. Dayton View Acad.*, No. 3:11-cv-49, 2011 WL 5554017, at *8 (S.D. Ohio Nov. 11, 2011) (granting summary judgment where allegedly defamatory statements were made by employee) (citing *Byrd*, 57 Ohio St.3d 56).

Here, with regard to all of the comments said directly to Young or written about Young throughout the DP&L facility, Young points to no evidence and makes no argument that any statements made by Young's co-employees were made within the scope of employment. Accordingly, DP&L's Motion for Summary Judgment is **GRANTED** with regard to Young's defamation/slander claims.[10]

## IV. CONCLUSION

For the forgoing reasons, there being no genuine issue as to any material fact, and Defendant DP&L being entitled to judgment as a matter of law, Defendant DP&L's Motion for Summary Judgment (Doc. 12) is **GRANTED** in its entirety and this case is terminated.

---

[10] Instead of providing specific argument in support of his claim for defamation, Young simply quotes a note from the records of John Swann. That note purportedly documents a telephone contact from Susan Spires, a human resources employee with DP&L. The note, written by Swann, apparently documents a contact from Spires wherein Spires indicates that an employee told her, a plant manager and a coal handling manager the opinion that Young "could be dangerous to others" and that Young wrote the messages at the DP&L facility about himself. Young argues that Swann's note demonstrates that DP&L "acted upon statements of an employee in the scope of its employment." Young fails to elaborate how Spires' report to Swann, apparently in aid of Youngs' treatment, renders DP&L liable for employees' purportedly defamatory statements about Young. The Court concludes that Young's mere citation to Swann's note fails to create an issue of fact regarding DP&L's liability for purportedly defamatory remarks made by its employees.

**IT IS SO ORDERED.**

Date:  May 14, 2012

_s/ Timothy S. Black_
Timothy S. Black
United States District Judge